UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA,

v.

CHRISTOPHER YEAGLEY,

                Petitioner-Defendant.

---

Case No. 13-CV-2561 (KMK)
Case No. 08-CR-707 (KMK)

OPINION & ORDER

Appearances:

Christopher Yeagley
*Pro Se Petitioner*

Anna M. Skotko, Esq.
Assistant United States Attorney
United States Attorney's Office
*Counsel for Respondent*

KENNETH M. KARAS, District Judge:

        Pro se petitioner Christopher Yeagley ("Petitioner") has filed a Petition, pursuant to 28 U.S.C. § 2255, to vacate, set aside or correct his sentence.  For the reasons stated herein, the Petition is dismissed.

## I.  BACKGROUND

### A.  The Indictment and Trial

        Indictment S3 08-CR-707 (the "Indictment") was filed on October 1, 2009, in six counts, only two of which named Yeagley as a defendant.  Count One charged Petitioner and another individual (Ramel Williams) with participating in a conspiracy to distribute and possess with intent to distribute one kilogram and more of heroin, in violation of Title 21, United States Code,

Sections 812, 841(a)(1), 841(b)(1)(A), and 846.  Count Two charged Petitioner alone with distributing and possessing with intent to distribute heroin on or about March 26, 2008, in violation of Title 21, United States Code, Sections 812, 841(a)(1), and 841(b)(1)(C).[1]

Williams pled guilty to Counts One, Three, Four, Five, and Six of the Indictment on November 2, 2009.  Trial against Petitioner commenced on November 17, 2009 and ended on December 15, 2009 with a guilty verdict on both counts against Petitioner.  On June 2, 2010, the Court sentenced Petitioner to concurrent terms of 235 months' imprisonment, which it ordered to be followed by concurrent terms of five years' supervised release, and imposed a $200 mandatory special assessment.[2]  Throughout the trial and sentence, Petitioner was represented by Michael H. Sussman, Esq.

At trial, the Government offered evidence that entitled the jury to conclude that, from at least in or about December 2007 through in or about February 2009, Petitioner participated in a heroin distribution conspiracy that sold over one kilogram of heroin in Newburgh, New York. The Government also offered evidence from which the jury could conclude that on March 26, 2008, Petitioner distributed and possessed with the intent to distribute heroin outside of his residence at 197 First Street, also in Newburgh.  In particular, the Government presented

---

[1] Count Three charged Williams alone with distributing and possessing with intent to distribute heroin, in violation of Title 21, United States Code, Sections 812, 841(a)(1), and 841(b)(1)(C).  Count Four charged Williams alone with distributing and possessing with intent to distribute MDMA, commonly known as "ecstasy," in violation of Title 21, United States Code, Sections 812, 841(a)(1), and 841(b)(1)(C).  Count Five charged Williams alone with possessing a firearm after having been convicted of a felony, in violation of Title 18, United States Code, Section 922(g)(1).  Count Six charged Williams alone with using and carrying a firearm during and in relation to a drug trafficking crime for which he may be prosecuted in federal court, in violation of Title 18, United States Code, Section 924(c)(1)(A)(I).

[2] The Court sentenced Williams to concurrent terms of 360 months' imprisonment, which it ordered to be followed by concurrent terms of five years' supervised release, and imposed a $500 mandatory special assessment.

testimony from three individuals who had previously delivered drugs for and/or bought drugs from Petitioner. A number of law enforcement officers from the Bureau of Alcohol, Tobacco, Firearms, and Explosives and the City of Newburgh Police Department also testified and presented evidence regarding the arrests of Petitioner and his co-conspirators, the narcotics and firearms seized in the course of those arrests, the analyses of cell phone call records, and the forensic examination of cell phones found at various drug sale locations used by Petitioner and his crew.

According to the Government's witnesses, Williams and others worked as "runners" for Petitioner, taking orders from and delivering drugs to Petitioner's customers and transporting Petitioner's supply of heroin from the Bronx to Newburgh. (Trial Tr. 677–82, 927–44, 1045–54, 1064–79.) Petitioner and his crew sold a particular brand of heroin, known as "Take 2," that was identified by a red or blue stamp containing the text "Take 2" and an image of an old-fashioned movie camera on each glassine envelope of heroin. (*Id.* at 621–22, 1050.)

The evidence also established that Petitioner and his runners used a cell phone referred to as the "Work Phone" to receive orders for heroin and arrange for the delivery of the heroin to customers. (*Id.* at 969–71, 992–93.) During the spring and summer of 2008, the Work Phone received and made thousands of calls and direct-connect contacts each month. (*Id.* at 1710–23.) There also was evidence that Petitioner and his crew sold heroin to customers on the street and at two main sale locations in Newburgh—a three-story house at 197 First Street (where Petitioner lived until the summer of 2008) and an abandoned garage at 46 Chambers Street (where Williams was arrested in June 2008). (*Id.* at 941–42, 953.) Accomplice testimony established that Petitioner and his crew kept substantial quantities of heroin at, and sold heroin from, both locations during the course of the conspiracy. (*Id.* at 941–43, 953–54, 986–89.) There was also

3

evidence that Petitioner and Williams kept firearms and ammunition at the garage at 46 Chambers Street. (*Id.* at 1002–04, 2011.)

The defense case consisted of three witnesses: Petitioner; his brother, David Yeagley; and Ramel Williams. (*Id.* at 1807–2092.) These witnesses testified that Petitioner had not sold or conspired to sell heroin. (*Id.* at 1904–05, 1927.) Petitioner himself also testified that he had not possessed drugs or engaged in any drug transaction on March 26, 2008, when he was arrested outside of 197 First Street. (*Id.* at 1984–2038.)

After the case went to the jury, Mr. Sussman informed the Court that he had another trial to conduct and that, with Petitioner's consent, Mr. Sussman's law partner, Christopher Watkins, Esq., would be present in his place. (*Id.* at 2297–301.) In the morning of the second day of deliberations, the jury sent a note that read as follows: "Dear Judge Karas: Must we be unanimous on both charges against C. Yeagley? If not, what happens?" (*Id.* at 2333.)[3] The Court shared the note with counsel and then the following discussion took place:

> THE COURT: . . . The answer is, yes, on each charge, they have to be unanimous collectively on both, and I think that's what I should just tell them. Anybody got problems with that?
>
> [MR. WATKINS]: I don't, I don't necessarily have a problem with it. It is a bit ambiguous, because they used the term on both counts as opposed to on each charge.
>
> THE COURT: Right. And I'm sure Mr. Yeagley is wondering, as I think we all are, that there is only one defendant, so I don't know who else they would have to be unanimous on, but they have figured that one out, so. So I think we will bring them in, and we tell them they have to be unanimous as to each charge, and I think we will leave it at that. Now, if they tell us that they are hung on one or both of the charges, then they tell us and we will deal with that issue when we—if and when it arises. I don't take this as that note. Anybody have a different view?

---

[3] It bears noting that the Court instructed the jury on Friday, December 11, 2009, but the jury did not begin deliberating until the following Monday (December 14, 2009). On that first day of deliberations, the jury deliberated from approximately 10:00 a.m. until approximately 2:00 p.m. The aforementioned note was sent at approximately 9:53 a.m. on the morning of the second day of deliberations. (Trial Tr. 2333.)

[THE GOVERNMENT]: No, Your Honor.

[MR. WATKINS]: No.

(*Id.* at 2333–34.)

The jury returned to the courtroom at approximately 10:06 a.m., and the Court, in the

presence of Petitioner and his counsel (and Government counsel), provided the following

instruction to the jury:

> THE COURT: Good morning. Please be seated. I hope you had a pleasant evening.
> We are in receipt of your most recent note, which reads, "Dear Judge Karas, must
> we be unanimous on both charges against C. Yeagley? If not, what happens?" The
> answer is, you must be unanimous as to each of the two charges in the Indictment,
> and of course Mr. Yeagley is the only person charged, so the answer is that you
> must be unanimous. All right. I hope that answers your question.

(*Id.* at 2335.) The jury resumed its deliberations. No party offered a subsequent objection to this

charge.

After deliberating into the afternoon, the jury sent another note asking for additional

instruction on the issue of constructive possession. (*Id.* at 2336.) After consulting with the

Parties, the Court again addressed the jury in the Courtroom (at approximately 12:58 p.m.). The

jury then returned to the jury room. At approximately 1:15 p.m., the jury sent a note reporting

that it had reached a verdict. (*Id.* at 2349.)

The jury returned a guilty verdict on both counts against Petitioner. Before discharging

the jurors, the Court polled each juror to confirm the verdict. (*Id.* at 2350–52.)

B. Post-Trial Events and Motions

On December 21, 2009, six days after the jury returned its verdict, the Court received a

letter from a juror in the case, which the Court promptly forwarded to the Parties. (*See* Dkt. No.

83 (08-CR-707 Dkt.).) In her letter, the juror claimed that she "voted yes to find [Petitioner]

guilty of the charges although [she] strongly disagreed to his guilt on the second charge" (the

5

substantive distribution charge). (*Id.*) While not denying that she voted guilty on both counts, the juror claimed that she felt "troubled by [her] decision" as to Count Two and wondered if "something can be done to fix" the verdict. (*Id.*) There was nothing in the letter suggesting that the juror had any reservations about the jury's verdict as to Count One. Instead, the juror asserted that there had been "extreme pressure placed on [her] by the other jurors," and complained about the "climate in the jury room." (*Id.*) The juror also indicated that she had wanted to be excused from the jury, but that the foreperson declined to write a note relaying that request. Moreover, notwithstanding the fact that the jury deliberated only parts of two days and returned its verdict on December 15, 2009, the juror said that there was "frustration and anger at having had to sit through the hearing for so long as well as having to deliberate through the Christmas season." (*Id.*) Finally, the juror indicated that she was the one "who requested from the judge if it was possible to find Mr. Yeagley guilty on the first charge and be split on the second count."

Counsel for Petitioner moved the Court to conduct a post-verdict inquiry of the juror. The Court denied this motion in an Opinion and Order dated March 10, 2010. *See United States v. Yeagley*, 706 F. Supp. 2d 431 (S.D.N.Y. 2010). Among other things, the Court noted that there was no evidence of any "outside influence" that affected the deliberations, and that the juror had plenty of opportunity during deliberations to communicate her concerns to the Court, including when the Court excused the jurors in person at the end of each day, when the Court addressed the jury's notes in person, and when the jury was polled after returning its verdict. *Id.* at 433–35.

Petitioner filed a motion for an order or acquittal and/or a new trial, pursuant to Rules 29 and 33 of the Federal Rules of Criminal Procedure. In this Motion, Petitioner claimed that (i) the Court erred in denying the suppression motion related to the seizure of drugs from Petitioner's

front lawn, (ii) there was insufficient evidence to support the jury's verdict, (iii) the Government misrepresented certain evidence to the jury, (iv) the Court erred in its response to the jury's note about unanimity, and (v) the Court erred when it declined to conduct a post-verdict inquiry regarding complaints raised by the one juror.  The Court denied these motions.  (*See* Dkt. No. 113; Tr. 2–23 (June 2, 2010).)

The sentence took place on June 2, 2010.  The Court's calculation of the applicable Guidelines range included a two-level enhancement for Petitioner's managerial role in the offense conduct and a two-level enhancement for obstruction, owing to Petitioner's perjurious testimony at the trial.  (Tr. 58–74 (June 2, 2010).)  The Court imposed a sentence of 235 months' imprisonment, which was the low end of the Guidelines range.

Represented by new counsel, Petitioner appealed his conviction and sentence, again raising the claim that the Court erred in denying the suppression motion and in responding to the jury's note about unanimity.  In a summary order, the Second Circuit rejected Petitioner's claims and affirmed the conviction and sentence.  *See United States v. Williams*, 482 F. App'x 615 (2d Cir. 2012) (summary order).  Regarding the suppression issue, the Second Circuit determined that the facts supported this Court's determination that exigent circumstances justified the warrantless seizure of the narcotics.  *Id*. at 616–17.  As to the jury's note, the Second Circuit held that the claim was waived, because Petitioner's counsel "explicitly accepted" this Court's proposed instruction before it was given."  *Id.* at 617.

Petitioner subsequently filed the instant § 2255 Petition.[4]

---

[4] Petitioner also has filed a Supplemental Petition.  (Dkt. No. 7 (13-CV-2561).)

## II.  DISCUSSION

### A.  Standard of Review of a Section 2255 Petition

A prisoner in federal custody may move to vacate, set aside or correct his sentence only "upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack."  28 U.S.C. § 2255(a).[5]  "Because collateral challenges are in tension with society's strong interest in the finality of criminal convictions, the courts have established rules that make it more difficult for a defendant to upset a conviction by collateral, as opposed to direct, attack." *Yick Man Mui v. United States*, 614 F.3d 50, 53 (2d Cir. 2010) (internal quotation marks omitted).  To prevail on a collateral attack of a final judgment under § 2255, a petitioner must demonstrate either the existence of a "constitutional error . . . or an error of law or fact that constitutes a fundamental defect which inherently results in a complete miscarriage of justice." *United States v. Bokun*, 73 F.3d 8, 12 (2d Cir. 1995) (internal quotation marks omitted); *accord Cuoco v. United States*, 208 F.3d 27, 30 (2d Cir. 2000).

---

[5] Title 28 U.S.C. § 2255(a) provides:

> A prisoner in custody under sentence of a court established by Act of Congress claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside or correct the sentence.

In ruling on a § 2255 petition, the district court is required to hold a hearing "[u]nless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief." 28 U.S.C. § 2255(b); *see also Gonzalez v. United States*, 722 F.3d 118, 130 (2d Cir. 2013). A hearing is not required where the petitioner's allegations are "vague, conclusory, or palpably incredible." *Machibroda v. United States*, 368 U.S. 487, 495 (1962). Instead, to justify a hearing, the petition must set forth specific facts supported by competent evidence, raising detailed and controverted issues of fact that, if proved at a hearing, would entitle the petitioner to relief. *See Gonzalez*, 722 F.3d at 131. Finally, because Petitioner is appearing pro se, the Court construes the Petition liberally and interprets it to raise the strongest arguments that it suggests. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007); *Green v. United States*, 260 F.3d 78, 83 (2d Cir. 2001); *McPherson v. Coombe*, 174 F.3d 276, 280 (2d Cir. 1999).

B.  Analysis

Petitioner claims his Petition should be granted because the Court erred in responding to the jury's note about unanimity; because his trial counsel was ineffective for failing to object to the Court's response to the jury's note, and for incompetently arguing the suppression motion and for failing to re-open the suppression hearing after the trial; and because his appellate counsel was incompetent for failing to make certain arguments to challenge this Court's finding of exigent circumstances in connection with the suppression motion.

1.  The Court's Response to the Jury's Unanimity Note

Petitioner first argues that the Court's response to the jury's question regarding unanimity was improper and unduly coercive. (Pet'r's Mem. Br. in Supp. of Pro Se Mot. Brought Pursuant to 28 U.S.C. § 2255 ("Pet'r's Mem.") 6–17 (Dkt. No. 2, 13-CV-2561).) This claim never makes it out of the blocks, as it was squarely rejected by the Second Circuit on direct appeal. In

9

particular, the Second Circuit held that "because Yeagley's counsel explicitly accepted the court's proposed instruction before it was given, he has waived his right to challenge that instruction on appeal."  482 F. App'x at 617 (citing *United States v. Polouizzi*, 564 F.3d 142, 153 (2d Cir. 2009)).  Because of this clear ruling, Petitioner may not raise this issue in his Petition.  In particular, in petitions seeking collateral relief under § 2255, "two separate rules regarding claim preclusion based on a prior adjudication apply."  *Yick Man Mui*, 614 F.3d at 53.  The first is the so-called "mandate rule," which bars re-litigation of issues or claims that were resolved, explicitly or implicitly, on direct appeal.  *See id.*; *see also id.* at 55 (holding that "a Section 2255 petitioner may not 'relitigate questions which were raised and considered on direct appeal,'" (quoting *United States v. Becker*, 502 F.3d 122, 127 (2d Cir. 2007))); *Burrell v. United States*, 467 F.3d 160, 165 (2d Cir. 2006) ("[T]he trial court is barred from reconsidering or modifying any of its prior decisions that have been ruled on by the court of appeals." (internal quotation marks omitted)).[6]  Of course, the Court recognizes that Petitioner also claims that his trial counsel was ineffective for agreeing to the Court's response to the jury note and that he did not raise an ineffective assistance claim in his direct appeal, but that claim raises a separate question that will be addressed below.  As to this particular point, however, it suffices to say that the Second Circuit has foreclosed this Court from accepting Petitioner's argument that the Court erred in its response to the jury's note.  *See Bedoya-Cano v. United States*, No. 07-CV-9276, 2008 WL 4200167, at *11 (S.D.N.Y. May 29, 2008) (noting that the Court of Appeals had determined that the petitioner had waived an argument and holding that petitioner was therefore

---

[6] The second rule "prevents claims that could have been brought on direct appeal from being raised on collateral review," unless the petitioner can show both cause and actual prejudice.  *See Yick Man Mui*, 614 F.3d at 54.  However, that rule has no application here.

"procedurally barred from relitigating this . . . argument now in a [§] 2255 habeas petition"), *adopted by* 2008 WL 4298498 (S.D.N.Y. Sept. 11, 2008).

Even if Petitioner had not waived this claim, however, the claim falls on the merits. To begin, it bears emphasizing that a trial court "enjoys considerable discretion in construing the scope of a jury inquiry and in framing a response tailored to the inquiry." *United States v. Rommy*, 506 F.3d 108, 126 (2d Cir. 2007); *see also United States v. Young*, 140 F.3d 453, 456 (2d Cir. 1998) (noting that a response to a jury inquiry "is a matter committed to the sound exercise of a trial court's discretion"). Thus, while Petitioner has his own interpretation of the note, the Court is not and was not required to accept that interpretation. In particular, Petitioner argues that the note "actually asked **two** questions," one indicating an "unsureness of whether a universal accord was required on both counts," which "implied the possibility of an inability to reach a dispositive verdict, to some extent, on one or both counts," and the other addressing the "consequence of the failure to achieve unanimity," and thus "suggest[ing] the notion of an inability to agree." (Pet'r's Mem. 9 (emphasis in original).) To be sure, while Petitioner offers a suggestion that there was a "possibility" that the jury could not reach a unanimous verdict, the jury's note did not say the jury was deadlocked or otherwise at an impasse. Thus, the Court was not required to adopt this view of the jury's note. *Cf. United States v. McDonald*, 825 F. Supp. 2d 472, 480 (S.D.N.Y. 2011) ("In this case, the Court was notified by the poll of a lack of unanimity, but not necessarily a deadlock: the jurors had all signed the verdict sheet indicating a guilty verdict, and their lack of unanimity only came out during the poll."), *aff'd*, 759 F.3d 220 (2d Cir. 2014).

Whatever may be said of Petitioner's interpretation of the jury's note, the Court was within its discretion to interpret the note as a follow-up to the previously-given instruction that

any verdict the jury reached as to each count had to be unanimous. And, in fact, the Court shared this interpretation with counsel, commenting that while the note asked about whether the jury had to be unanimous on both charges, the Court would instruct the jury that it had to be unanimous on *each* charge. (Trial Tr. 2333–34.) In response, counsel for Petitioner agreed with the Court's reaction to the note, even while suggesting that the note was "a bit ambiguous, because they used the term on both charges as opposed to each charge." (*Id.*) Given this interpretation, there was nothing improper about telling the jury what the Court had already and properly told the jury—that its verdict as to *each* charge had to be unanimous. *See United States v. Schiff*, 801 F.2d 108, 114 (2d Cir. 1986) (noting that because a "jury must reach a unanimous verdict as to the factual basis for a conviction," it is proper for a trial court to give a "general instruction on unanimity . . . to insure that such a unanimous verdict is reached"); *see also United States v. Barner*, 561 F. App'x 33, 38 (2d Cir. 2014) (upholding verdict where the district court instructed jury that its verdict must be unanimous where evidence as to possession was the same for each firearm); *United States v. Brokemond*, 959 F.2d 206, 209 (11th Cir. 1992) ("The reemphasis of the unanimity requirement in the supplemental instruction was merely a reiteration of that part of the initial charge. In no way did the supplemental instruction suggest to the jury *which* verdict it should return.").

Moreover, there was nothing coercive about the Court's response to the jury's note. In evaluating the propriety of a supplemental instruction, the courts must determine whether the "instruction by itself so infected the entire trial that the resulting conviction violates due process." *Cupp v. Naughten*, 414 U.S. 141, 147 (1973). The Supreme Court has emphasized that the evaluation of a supplemental charge should be done "in its context and under all the circumstances." *Lowenfield v. Phelps*, 484 U.S. 231, 237 (1988) (internal quotation marks

omitted); *see also Campos v. Portuondo*, 320 F.3d 185, 187–88 (2d Cir. 2003) (noting that the state court properly applied the *Lowenfield* standard in evaluating a supplemental jury instruction); *Watson v. Alabama*, 841 F.2d 1074, 1076 (11th Cir. 1988) ("The applicable standard here is whether under the totality of the circumstances the trial judge's instruction to the jury was coercive.").  Among the circumstances to be considered is the interplay between the supplemental instruction and the overall charge given to the jury.  Indeed, the Supreme Court has held that it is a "well[-]established proposition that a single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge." *Cupp*, 414 U.S. at 146–47; *see also DelValle v. Armstrong*, 306 F.3d 1197, 1201 (2d Cir. 2002) (same). Here, there is no challenge to the Court's original instruction regarding unanimity, which is unsurprising because the Court instructed the jury that while its verdict on each count was to be unanimous, the jury was required to consider the opinions of all jurors and that each juror was not required to change his/her view of the case merely because a majority might have a different view.  Moreover, the Court instructed the jury that its verdict as to one count must not dictate its verdict as to the other count.  (*See* Trial Tr. 2239.)  Thus, in the context of the whole charge given to the jury, there was nothing coercive about the Court's response to the jury's note regarding unanimity.  *See Brokemond*, 959 F.2d at 209 ("Viewing the supplemental instruction [reemphasizing the unanimity requirement] in light of the totality of the overall charge, which was correct in all respects, we find that it was not coercive and thus not a violation of appellant's constitutional rights."); *Watson*, 841 F.2d at 1076–77 (upholding supplemental instruction reminding jurors of unanimity requirement in light of the trial court's overall charge to the jury).

It also is appropriate to consider whether there are any "indicators of coercion outside the language of the instruction itself." *Rivera v. West*, No. 10-CV-8496, 2011 WL 3648627, at *8

(S.D.N.Y. Aug. 18, 2011).  One such indicator is the time that elapses between the supplemental charge and the jury's verdict, with the assumption being that the longer a jury deliberates after receiving a supplemental instruction from the trial judge, the less likely the instruction coerced the verdict.  *See Spears v. Greiner*, 459 F.3d 200, 206–07 (2d Cir. 2006) (considering the length of time the jury deliberated after being given a supplemental instruction from the trial judge); *accord United States v. Williams*, 819 F.3d 1026, 1034 (7th Cir. 2016) ("[A] supplemental instruction is less likely to have been coercive when the jury deliberated for a long time after receiving the instruction before returning a verdict.  Conversely, it is somewhat more likely that a potentially coercive instruction was in fact coercive when the jury returns a verdict very quickly after receiving the instruction." (citations omitted)).  While the courts have not identified a bright line that establishes a threshold of deliberation time that takes a case beyond the point of coercion, the courts have routinely held that a jury's verdict that follows a supplemental instruction by at least two to three hours suggests the absence of coercion.  *See, e.g.*, *Rivera*, 2011 WL 3648627, at *8 (holding that the fact that the jury deliberated for "approximately two and one half hours after receiving the supplemental charge" was consistent with a lack of coercion); *Texidor v. Artus*, No. 06-CV-7173, 2007 WL 1982271, at *6 (S.D.N.Y. July 10, 2007) (holding that a jury's post-supplemental instruction deliberation period of two and one half hours did not suggest coercion where the jury deliberate for four hours prior to the supplemental charge).

In this case, the Court responded to the jury's note about unanimity at approximately 10:06 a.m.  The jury deliberated for just over three hours before sending a note (at approximately 1:15 p.m.) that it had reached a verdict (and after sending the Court another note on a different topic and receiving a response to it).  That the jury had deliberated for over three hours the day

14

before it sent the unanimity note and then another three hours after the Court's supplemental instruction strongly suggests that there was nothing coercive about the Court's response to the jury's note. *See United States v. Crispo*, 306 F.3d 71, 77 (2d Cir. 2002) (holding that an absence of coercion could be inferred from fact that the jury was given a supplemental *Allen* charge at 10:25 a.m., but did not return a verdict until "some time after lunch"). Thus, for all these reasons, the Court rejects Petitioner's claim regarding the Court's response to the jury's unanimity note.

### 2. Ineffective Assistance of Trial Counsel

Petitioner claims that his trial counsel was ineffective for agreeing to the Court's response to the jury's unanimity note and for failing to effectively argue for suppression of the narcotics seized from Petitioner's front yard and for failing to seek to re-open the suppression hearing after trial.

### a. Standard of Review of Ineffective Assistance Claims

Claims of ineffective assistance of counsel are evaluated under the framework set forth in *Strickland v. Washington*, 466 U.S. 668, 687 (1984). "First, the [petitioner] must show that counsel's performance was deficient." *Strickland*, 466 U.S. at 687. "Second, the [petitioner] must show that the deficient performance prejudiced the defense." *Id.*

Petitioner will not meet the first prong based solely on disagreements with counsel's strategy or advice. Indeed, there is a "strong presumption" that counsel's conduct fell within the vast spectrum of reasonable assistance, and it is Petitioner's burden to demonstrate "that counsel's representation was unreasonable under prevailing professional norms and that the challenged action was not sound strategy." *Kimmelman v. Morrison*, 477 U.S. 365, 381 (1986); *see also Bonilla v. Lee*, 35 F. Supp. 3d 551, 575 (S.D.N.Y. 2014); *Henderson v. Martuscello*, No.

10-CV-5135, 2013 WL 6463348, at *15 (S.D.N.Y. Dec. 10, 2013). Thus, to satisfy this prong, Petitioner must demonstrate that counsel "made errors so serious that counsel was not functioning as the 'counsel' guaranteed . . . by the Sixth Amendment." *Strickland*, 466 U.S. at 687. In assessing counsel's conduct, "a reviewing court must judge his conduct on the basis of the facts of the particular case, 'viewed as of the time of counsel's conduct,' and may not use hindsight to second-guess his strategy choices." *Mayo v. Henderson*, 13 F.3d 528, 533 (2d Cir. 1994) (citation omitted) (quoting *Strickland*, 466 U.S. at 690).

With respect to the "prejudice" prong, "the defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding below would have been different." *United States v. Caracappa*, 614 F.3d 30, 46 (2d Cir. 2010) (alteration and internal quotation marks omitted). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. "It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding," as "[v]irtually every act or omission of counsel would meet that test, and not every error that conceivably could have influenced the outcome undermines the reliability of the result of the proceeding." *Id.* at 693 (citation omitted). "'[P]urely speculative' arguments about the impact of an error do not establish prejudice." *DeCarlo v. United States*, No. 11-CV-2175, 2013 WL 1700921, at *4 (S.D.N.Y. Apr. 17, 2013) (alteration in original) (quoting *United States v. Weiss*, 930 F.2d 185, 199 (2d Cir.1991)). In *Harrington v. Richter*, 562 U.S. 86 (2011), the Supreme Court elaborated on the standard that defendants must meet to prove prejudice under Strickland's second prong:

> In assessing prejudice under *Strickland*, the question is not whether a court can be certain counsel's performance had no effect on the outcome or whether it is possible a reasonable doubt might have been established if counsel acted differently. Instead, *Strickland* asks whether it is reasonably likely the result would have been

16

different. This does not require a showing that counsel's actions more likely than not altered the outcome, but the difference between *Strickland*'s prejudice standard and a more-probable-than-not standard is slight and matters only in the rarest case. The likelihood of a different result must be substantial, not just conceivable.

*Id.* at 111–12 (citations and internal quotation marks omitted); *see also Cullen v. Pinholster*, 563 U.S. 170, 189 (2011) ("A reasonable probability is a probability sufficient to undermine confidence in the outcome. That requires a 'substantial,' not just 'conceivable,' likelihood of a different result." (internal quotation omitted)); *Figueroa v. Schiraldi*, No. 10-CV-1821, 2013 WL 3486925, at *5 (S.D.N.Y. July 8, 2013) ("[T]he likelihood of a different result must be substantial, not just conceivable." (internal quotation omitted)); *Wright v. Lee*, No. 12-CV-6140, 2013 WL 1668266, at *5 (E.D.N.Y. Apr. 17, 2013) ("[P]etitioner did not come close to meeting the standard for showing prejudice under *Strickland* . . . . [T]here is no 'substantial' likelihood that if petitioner's trial counsel had objected to the prosecutor's summation, the result of the trial would have been any different." (internal quotation marks omitted)).

  b. Ineffective Assistance Regarding the Court's Response to the Jury's Unanimity Note

  As noted, Petitioner's first claim is that trial counsel was ineffective for failing to object to the Court's response to the jury's unanimity note. Judged under the demanding standard of review of any ineffective assistance claim, Petitioner's assertion of ineffective assistance falls far short of the mark. First, as discussed above, there was nothing improper about the Court's response to the jury's note. Based on the Court's interpretation of the note, it instructed the jury in a way that was consistent with the original instructions given to the jury, which instruction included the proposition that the jury's verdict as to each count had to be unanimous, that the jury should return a verdict only after each juror has had a chance to be heard, that all jurors' opinions should be respected, and that the jury's verdict as to each count was to be unaffected by

17

its verdict as to any other count.  Second, as noted above, there was nothing coercive about the

Court's supplemental instruction, as evidenced by the large gap in time between the jury's

receipt of the Court's instruction and the jury's verdict.  Put simply, because the Court's

response to the note was neither improper nor coercive, counsel was not ineffective for electing

not to advocate for a different response to the note.  Moreover, Petitioner has offered no basis to

think the jury's verdict would have been different had the Court provided a response akin to the

one Petitioner now says he wanted his counsel to suggest.  Thus, he has failed to meet either

prong of the *Strickland* test.[7]

---

[7] Related to this point, Petitioner complains that the presence of Mr. Watkins in place of Mr. Sussman, who had to begin another trial in a different court, left Petitioner without effective representation.  This claim is baseless.  Petitioner was advised and approved of Mr. Watkins' presence before the day of Mr. Sussman's absence.  (Trial Tr. 2297–301.)  Indeed, Mr. Watkins was present for all the jury's deliberations and for the verdict and obviously was available to consult with Petitioner.

Moreover, the Court gives no credence to Mr. Sussman's assertion, in his brief in support of the Rule 33 Motion, that Mr. Watkins was not experienced.  (Mem. in Supp. of Def.'s Mot. for New Trial 34 n.1 (Dkt. No. 99, 08-CR-707).)  Petitioner understandably cites this statement in support of his claim.  Of course, if Mr. Sussman really believed Mr. Watkins was so inexperienced that he should not have been covering for Mr. Sussman, then it is fair to question Mr. Sussman's judgment and/or integrity in asking his long-time law partner to do so.  However, the Court would be surprised if Mr. Sussman had anything other than full confidence in his law partner to cover the deliberations, and, instead, the Court questions Mr. Sussman's good faith in denigrating Mr. Watkins for the sole purpose of prevailing in the post-trial motion.

In any event, there is simply no evidence that there was a constitutional foul merely from the fact that Mr. Sussman was unable to be present during the jury's deliberations and that Mr. Watkins acted in his stead.  *See United States v. Phillips*, 664 F.2d 971, 1040–41 (5th Cir. 1982) (finding no violation of the right to counsel where defense counsel was temporarily absent from the trial, defendant was represented by other counsel, and where defendant, expressly consented to the temporary representation by other counsel), *superseded on other grounds as recognized in United States v. Huntress*, 956 F.2d 1309 (5th Cir. 1992).  And, because Petitioner has not established, or even proffered specific facts that could establish, that the outcome would have been different had Mr. Sussman been present, Petitioner fails to meet the prejudice prong of *Strickland*.

<u>c.  Ineffective Assistance Related to the Suppression Motion</u>

Petitioner also argues that his trial counsel was ineffective for failing to competently argue for suppression of the narcotics seized from his front yard.  (Pet'r's Mem. 23–44.)  As an initial matter, the Second Circuit, in affirming Petitioner's conviction, held that the facts supported "the district court's determination that Officer Lahar would have been objectively reasonable in believing that the evidence was at risk of destruction and the officers' safety was threatened."  *Williams*, 482 F. App'x at 617.  Thus, because this issue was resolved against Petitioner on direct appeal, he may not re-litigate any claim that this Court erred in denying the suppression motion.  *See Yick Man Mui*, 614 F.3d at 53.  As with the jury note issue, the Court recognizes that Petitioner also claims that his trial counsel was constitutionally ineffective in how he litigated the suppression motion.  However, where an ineffective assistance claim involves an attorney's handling of a Fourth Amendment claim, a petitioner must demonstrate more than just the deficient performance of his counsel and the resulting prejudice from such a substandard performance; he also must show that there is a reasonable probability that the verdict would have been different absent the allegedly tainted evidence.  *See Kimmelman*, 477 U.S. at 382 ("Although a meritorious Fourth Amendment issue is necessary to the success of a Sixth Amendment claim . . . , a good Fourth Amendment claim alone will not earn a prisoner federal habeas relief.  Only those habeas petitioners who can prove under *Strickland* that they have been denied a fair trial by the gross incompetence of their attorneys will be granted the writ . . . .");  *Nell v. James*, 811 F.2d 100, 106 (2d Cir. 1987) ("Nell must establish, first, that counsel's representation was unreasonable under prevailing professional norms and that the challenged action was not sound strategy, . . . second, that he had a meritorious Fourth Amendment claim, and, finally, that there is a reasonable probability that the verdict would have been different had

19

the objectionable evidence not been admitted."); *Lacey v. Perez*, No. 10-CV-1460, 2013 WL

1339418, at *8 (E.D.N.Y. Mar. 28, 2013) (same).

Judged by this exacting standard, Petitioner's claim fails. First, the Court properly found

that, under the totality of circumstances, Officer Lahar's brief entry into the front yard to seize

the heroin that was fully justified by exigent circumstances. As the Second Circuit noted, in

upholding this Court's ruling on the suppression motion, Officer Lahar observed Petitioner in a

hand-to-hand narcotics transaction at 3:30 a.m., on the steps leading to Petitioner's residence,

which was in a high-crime area. *Williams*, 482 F. App'x at 617. When the officer asked

Petitioner and the other individual what they were doing, the third party put something in his

mouth and Petitioner dropped something over the fence and onto his yard. *Id.* After a back-up

officer arrived and began to search Petitioner, Officer Lahar observed several heroin packets near

where Petitioner had dropped something. *Id.* As the back-up officer placed Petitioner in

custody, Petitioner yelled toward his home. *Id.* After that, Officer Lahar stepped over the waist-

high fence and seized the heroin. *Id.* Given these facts, determined after the Court held a

hearing, the Court was well within its discretion to conclude that Officer Lahar's seizure of the

narcotics was justified by exigent circumstances because of a threat to the integrity of the

evidence and to the safety of the two officers on the scene. *Id.* (citing *United States v. Schaper*,

903 F.2d 891, 894 (2d Cir. 1990)).

In support of his Petition, Petitioner offers no new facts or law. Instead, he merely

reasserts that "not one fact supported a belief, based on anything articulable, that the scene faced

a potential threat from within or without." (Pet'r's Mem. 40.) That may well be his spin on the

evidence presented at the suppression hearing (after which the Court made credibility

determinations that were not favorable to Petitioner), but the Court's conclusions were amply

supported by the record, as the Second Circuit held. Moreover, there has been no change in the law in the Second Circuit (or elsewhere) that places the slightest doubt about the viability of the Court's holding. Indeed, as to the cases cited by Petitioner, he offers no quotes from any of them where the Second Circuit announced a changed course in its exigent circumstances jurisprudence. (*Id.* at 35–37, 41.)[8] Instead, many cases simply involved situations where the courts determined, based on the facts and circumstances in those cases, that there was not a basis for the officers to have seized evidence without a warrant. (*Id.* at 36 n.12.) Yet, as the Supreme Court has emphasized, because the question of exigency is almost entirely fact-driven, each case is to be evaluated on its own facts and circumstances. *See Missouri v. McNeely*, 133 S. Ct. 1552, 1559 (2013). Thus, the holdings in those cases do not dictate a different result here, especially when the result here was affirmed by the Second Circuit. Accordingly, Petitioner, once again, has failed to establish any violation of his Fourth Amendment rights.

Second, Petitioner has failed to demonstrate that his trial counsel's performance was constitutionally defective. Cherry-picking a handful of quotes from the transcript, Petitioner attempts to paint a picture of an attorney who simply gave up on any challenge to the

---

[8] The cases that Petitioner claims represent a change in the law are simply instances where the Second Circuit determined that there were insufficient facts to justify invocation of the exigent circumstances doctrine. (Pro Se Supplement to Mem. Br. in Supp. of Mot. Brought Pursuant to 28 U.S.C. § 2255 ("Supplemental Mem.") 49 (Dkt. No. 7, 08-CR-707 Dkt.).) *See, e.g.*, *United States v. Simmons*, 661 F.3d 151, 157 (2d Cir. 2011) (holding that warrantless search of residence was not justified by exigent circumstances); *United States v. Hassock*, 631 F.3d 79, 88 (2d Cir. 2011) (holding that a protective sweep conducted by law enforcement officers was unlawful because law enforcement officers had no authority to enter the residence at the outset). In neither case did the Second Circuit announce a new rule of law or that it was abandoning an old one. Moreover, in another case cited by Petitioner, *United States v. Moreno*, 701 F.3d 64 (2d Cir. 2012), the court merely reiterated the truism that not every instance of probable cause to believe that drugs are sold from a residence triggers the exigent circumstances doctrine, citing a dissent from a Sixth Circuit decision. *Id.* at 75 (citing *United States v. Chambers*, 395 F.3d 563, 576 (6th Cir. 2005) (Sutton, J., dissenting)).

Government's use of the heroin seized from Petitioner's yard. Nothing could be further from the truth. To begin, when Mr. Sussman came onto the case (after replacing Petitioner's first attorney), he asked for leave to file a new memorandum of law in support of the previously-filed suppression motion and in fact filed this supplement memorandum of law. (Dkt. No. 54 (08-CR-707 Dkt.).) Mr. Sussman also actively participated in the suppression hearing itself by vigorously cross-examining the Government's witnesses and offering Petitioner's testimony as well. While the motion was ultimately denied, it is simply untrue that trial counsel waived the white flag on this issue and was thereby ineffective. Indeed, Petitioner offers no after-the-fact suggestions of what his trial counsel should have done differently that would have changed the outcome of the hearing.

Moreover, Petitioner has utterly failed to establish that the verdict would have been different had the heroin that was seized from the yard was suppressed. Indeed, it bears remembering that Petitioner was convicted of two counts: one for conspiring to sell heroin and the other for the substantive offense of distributing and possessing with intent to distribute heroin. The substantive charge was based on the hand-to-hand sale that Officer Lahar witnessed. The evidence in support of both counts was overwhelming and so the loss of the heroin seized from Petitioner's yard would not have put a dent in the Government's case, which included the testimony of three individuals who sold heroin with, or bought heroin from, Petitioner. Among these three cooperating witnesses was the person Officer Lahar saw (Octavius Fryar) engaging in the hand-to-hand transaction that preceded the seizure. Fryar testified in detail about his heroin transactions with Petitioner, including the one that Officer Lahar witnessed. This testimony, as well as the testimony of the other cooperating witnesses, was buttressed by the testimony of other law enforcement personnel as well as physical items and documents, including telephone

records that laid bare the heroin distribution scheme that Petitioner led and the "Take 2" brand of heroin that Petitioner sold.[9]  Thus, Petitioner has failed to meet his burden of establishing that his lawyer's advocacy fell below the constitutional line, that his Fourth Amendment rights were violated, or that the result of his trial would have been different if he had prevailed on the suppression motion.  Accordingly, this claim is rejected.

Also rejected is Petitioner's claim that his trial counsel was ineffective for electing not to seek to re-open the suppression hearing after the trial.  On this point, Petitioner claims that the trial presented new evidence about Petitioner's outburst after his arrest after selling Fryar heroin in the early morning hours.  In particular, Petitioner contends that at the trial, Officer Lahar testified that Yeagley yelled something like, "Oh my God!"  (Trial Tr. 248, 253.)  This supposedly new fact, according to Petitioner, is to be viewed as undercutting the Court's finding of exigent circumstances.  However, the Government notes, and Petitioner does not dispute, that the content of Yeagley's outburst was not new, as it was available to him in an audio recording of the police radio call that was produced in pre-trial discovery.  (Mem. of Law in Opp'n to Christopher Yeagley's Pet. Pursuant to 28 U.S.C. § 2255 To Vacate, Set Aside, or Correct His Sentence 23 (Dkt. No. 12, 13-CV-2561 Dkt.).)  Moreover, Petitioner has failed to establish that

---

[9] Petitioner argues that the suppression of the heroin would have denied the Government the only "<u>direct</u>" connection between him and the "Take 2" brand of heroin, would have undercut the incriminating import of the cellphone evidence, and would have "voided mention of [Petitioner's] possession of a large sum of currency while meeting a drug dealer in the middle of the night."  (Supplemental Mem. 47.)  This is self-serving and wishful thinking.  First, Fryar's testimony was "direct" evidence of Petitioner's distribution of the heroin Officer Lahar seized.  It also was additional, direct evidence, which might have been corroborated by the seized heroin, but which also was corroborated by Officer Lahar's testimony about what he witnessed and which was corroborated by the cellphone evidence, which traced the communications between Petitioner and Fryar leading up to the hand-to-hand transaction.  While Petitioner's counsel attempted to impugn Fryar's credibility (and the other cooperating witnesses), the jury was entitled to believe this testimony.

this "new" information would have changed the outcome of the suppression motion, let alone

that the Court would have re-opened the hearing. The Court's initial finding of exigent

circumstances was not based on the particular content of the outburst, but on the fact of the

outburst, which easily could have alerted others in the residence of the presence of law

enforcement. And, in any event, the claim fails because, as noted above, Petitioner has failed to

establish that the outcome of the trial would have been different had the heroin not come into

evidence. Thus, there is no merit to this claim.

### 3. Ineffectiveness of Appellate Counsel

Petitioner also complains that his appellate counsel was ineffective for failing to

challenge the Court's finding of exigent circumstances based on the "new" evidence about the

substance Petitioner's outburst when arrested. The same two-pronged test under *Strickland*

applies to ineffective assistance claims related to appellate counsel. *See Claudio v. Scully*, 982

F.2d 798, 803 (2d Cir. 1992). However, it bears noting that the Second Circuit has held that "it

is not sufficient for the habeas petitioner to show merely that counsel omitted a nonfrivolous

argument, for counsel does not have a duty to advance every nonfrivolous argument that could

be made." *Mayo v. Henderson*, 13 F.3d 528, 533 (2d Cir. 1994). Consistent with this notion,

courts are to accord appellate counsel the "presumption that [she] decided which issues were

most likely to afford relief on appeal." *Pruett v. Thompson*, 996 F.2d 1560, 1568 (4th Cir. 1993).

Indeed, "[w]innowing out weaker arguments on appeal and focusing on those more likely to

prevail, far from being evidence of incompetence, is the hallmark of effective appellate

advocacy." *Smith v. Murray*, 477 U.S. 527, 536 (1986) (internal quotation marks omitted).

Thus, to prevail on an ineffective assistance of appellate counsel claim, a petitioner must "show[]

that counsel omitted significant and obvious issues while pursuing issues that were clearly and

significantly weaker." *Jackson v. Leonardo*, 162 F.3d 81, 85 (2d Cir. 1998) (internal quotation marks omitted).

Viewed in this lens, the claim fails. First, as noted above, Petitioner has not established that the substance of Petitioner's outburst was material to the Court's finding regarding the existence of exigent circumstances. Whether Petitioner yelled out "Oh my God!" or "Holy Cow" would not have changed the fact that Petitioner yelled something out while being arrested, thus potentially alerting those inside the residence to the presence of law enforcement. Indeed, as noted, the Court's initial finding was not based on the particular wording of Petitioner's outburst. Second, there were a number of factors that supported the Court's exigent circumstances finding (and the Second Circuit's affirmance of that finding). Officer Lahar and the back-up officer were in a high-crime area in the immediate aftermath of a hand-to-hand transaction, where the buyer (Fryar) had swallowed something and the seller (Petitioner) had discarded something under very suspicious circumstances. Plus, the officers did not know how many people were in the residence, but knew only that Petitioner had yelled something out when he was being arrested. Thus, it is far from clear that pointing to this portion of the trial testimony would have changed the result of the appeal (which already included a challenge to the Court's ruling on the suppression motion). Finally, as discussed above, even if the heroin that was seized that night should have been suppressed, Petitioner has failed to establish that the result of the case would have been altered, in light of the overwhelming evidence of guilt. As a result, Petitioner cannot establish that the result of his appeal would have been different, thus dooming his claim here. *See Smith v. Robbins*, 528 U.S. 259, 285–86 (2000) (holding that prejudice prong of *Strickland* requires showing "a reasonable probability that, but for . . . counsel's unreasonable [advocacy]," the result of the appeal would have differed).

### III. CONCLUSION

For the reasons discussed above, the Court dismisses Petitioner's Petition for Writ of Habeas Corpus.[10]

As Petitioner has not made a substantial showing of the denial of a constitutional right, a Certificate of Appealability shall not be issued, *see* 28 U.S.C. § 2253(c)(2); *Lucidore v. N.Y. State Div. of Parole*, 209 F.3d 107, 111–12 (2d Cir. 2000), and the Court further certifies, pursuant to 28 U.S.C. § 1915(a)(3), that an appeal from this judgment on the merits would not be taken in good faith, *see Coppedge v. United States*, 369 U.S. 438, 445 (1962) ("We consider a defendant's good faith . . . demonstrated when he seeks appellate review of any issue not frivolous."); *Burda Media Inc. v. Blumenberg*, 731 F. Supp. 2d 321, 322–23 (S.D.N.Y. 2010) (citing *Coppedge* and finding that an appeal may not be taken in forma pauperis if the trial court certifies in writing that it is not taken in good faith).

The Clerk of the Court is respectfully directed to enter a judgment in favor of Respondent and to close this case.

SO ORDERED.

Dated: January **3** , 2017
      White Plains, New York

KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE

---

[10] The Court finds that there is no need for a hearing. Petitioner offers no controverted facts that require resolution. Indeed, his claims rest on the record and on certain claims regarding changes in the law. As such, there is nothing to be gained from a hearing, as the Court has not assumed any disputed facts to be in the Government's favor, and otherwise can resolve the claims made on procedural or purely legal grounds.

26